SPECIAL RENDITION: APRIL 6, 2026
TO BE PUBLISHED

# Supreme Court of Kentucky

2026-SC-0122-I

JULIE MUTH GOODMAN                                                                                    MOVANT

ON REVIEW FROM COURT OF APPEALS
V.                              NO. 2026-CA-0321
FRANKLIN CIRCUIT COURT NO. 26-CI-00272

JASON NEMES, IN HIS OFFICIAL                                              RESPONDENTS
CAPACITY AS CHAIR OF THE HOUSE
OF REPRESENTATIVES
IMPEACHMENT COMMITTEE; DAVID
OSBOURNE, IN HIS OFFICIAL
CAPACITY AS SPEAKER OF THE
HOUSE OF REPRESENTATIVES;
KILLIAN TIMONEY; AND RUSSELL
COLEMAN, IN HIS OFFICIAL
CAPACITY AS ATTORNEY GENERAL
OF THE COMMONWEALTH OF
KENTUCKY

AND

2026-SC-0124-OA

JULIE MUTH GOODMAN                                                                                    PETITIONER

IN SUPREME COURT
V.

JASON NEMES, IN HIS OFFICIAL                                              RESPONDENTS
CAPACITY AS CHAIR OF THE HOUSE
OF REPRESENTATIVES

IMPEACHMENT COMMITTEE; DAVID
OSBOURNE, IN HIS OFFICIAL
CAPACITY AS SPEAKER OF THE
HOUSE OF REPRESENTATIVES;
KILLIAN TIMONEY; HONORABLE
PHILLIP J. SHEPHERD, JUDGE,
FRANKLIN CIRCUIT COURT; AND
RUSSELL COLEMAN, IN HIS OFFICIAL
CAPACITY AS ATTORNEY GENERAL
OF THE COMMONWEALTH OF
KENTUCKY

### OPINION AND ORDER BY CHIEF JUSTICE LAMBERT
### GRANTING PETITION FOR SUPERVISORY WRIT
### AND DECLARING MOTION FOR EMERGENCY INJUNCTIVE RELIEF MOOT

Julie Muth Goodman is a duly elected judge who currently serves the Fourth Division of the 22nd Circuit Court in Fayette County. On January 28, 2026, the Clerk of the House of Representatives received a four-page petition from Killian Timoney, a former member of the Kentucky House of Representatives, calling for Judge Goodman's impeachment. It was not accompanied by an affidavit. The basis for Mr. Timoney's petition was his allegation that Judge Goodman abused her judicial discretion and authority in six cases over which she presided. He was not a party in any case of which he complained against her. Five of those cases remain pending within the judicial branch.

The impeachment petition was referred to the House Impeachment Committee on January 29, 2026. After Judge Goodman responded to the petition, a hearing was held on March 16, 2026. The House Impeachment Committee heard testimony from Judge Goodman and two other witnesses,

2

neither of whom was Mr. Timoney. On March 20, 2026, the Kentucky House of Representatives issued Articles of Impeachment against Judge Goodman via House Resolution 124 (H.R. 124). The Senate is currently scheduled to hold a trial on the impeachment articles in the coming days.

On March 11, 2026, while her impeachment proceedings were still pending in the House of Representatives, Judge Goodman filed a motion for, *inter alia*, a temporary injunction in Franklin Circuit Court seeking to enjoin the House of Representatives from proceeding with her impeachment. That motion was denied by the circuit court on March 19, 2026, after which Judge Goodman sought relief from the circuit court's order with the Court of Appeals pursuant to RAP[1] 20(B) and emergency relief from the circuit court's order pursuant to RAP 20(D). The Court of Appeals denied her motion for emergency relief, and she thereafter filed a motion for emergency relief in this Court pursuant to RAP 20(F). She also filed a petition for a supervisory writ which requested consolidation with her RAP 20(F) motion for consideration on the merits. Her supervisory writ petition seeks a declaration that H.R. 124 constituted an encroachment upon the powers of the Judicial Branch, that it was a violation of the separation of powers doctrine, and that it violated her right to due process of law. She further requests that H.R. 124 and the articles of impeachment issued against her be declared void *ab initio*.

---

[1] Kentucky Rule of Appellate Procedure.

3

For the reasons that follow, we hereby invoke our inherent "power to issue all writs necessary in aid of [our] appellate jurisdiction, or the complete determination of any cause, or as may be required to exercise control of the Court of Justice[,]" and issue the following supervisory writ granting Judge Goodman's petition to declare H.R. 124 and the current impeachment proceedings against her void *ab initio*. Ky. Const. § 110(2)(a).

In *Commonwealth v. Carman*, this Court explained that "[a]s Section 110(2)(a) of the Constitution contains a provision which grants the Supreme Court supervisory control of the Court of Justice, virtually any matter within that context would be subject to its jurisdiction[,]" and that "the Court should exercise its supervisory power sparingly, and, generally only in cases where no other court has power to proceed." 455 S.W.3d 916, 922-23 (Ky. 2015) (internal quotation marks omitted). As the Legislature is attempting to supersede our authority to both supervise and correct, when warranted, the behavior of sitting judges, as well as the means by which the Judicial Branch addresses ordinary error correction through the appellate process, our authority to issue supervisory writs pursuant to Section 110 in "aid of [our] appellate jurisdiction, or the complete determination of any cause, or as may be required to exercise control of the Court of Justice" is properly invoked.

The General Assembly is hereby enjoined from any further proceedings in the current impeachment action against Judge Goodman. As we are granting her writ petition, her request for emergency relief pursuant to RAP 20(F) is rendered moot.

4

**1) The impeachment petition was invalid on its face.**

The Kentucky Constitution vests the power of impeachment solely with the General Assembly. Ky. Const. § 109. Impeachment proceedings may be initiated either by the House of Representatives *sua sponte* and without a petition, KRS[2] 63.020, or upon a petition by "any person." KRS 63.030(1). When, as here, impeachment proceedings are initiated via petition by a person, there are statutory requirements that must be satisfied for the petition to be valid and proceed. Namely, the petition must be "signed by [the petitioner], verified by his own affidavit and the affidavits of such others as he deems necessary[.]" KRS 63.030(1). Here, although Mr. Timoney signed and dated his petition for impeachment, the petition did not include a sworn or verified affidavit from anyone. Moreover, Mr. Timoney was not placed under oath during the House Impeachment Committee's hearing on the matter to attest to the allegations contained in his petition.

KRS 63.030 is not a rule established by this Court; it was enacted by the Legislature. The Legislature decided as a matter of public policy that a petition for impeachment must be verified by an affidavit. The Legislature violated its own rule in entertaining a petition for impeachment that did not follow this statutory mandate. This in and of itself is a fundamental, fatal flaw in the impeachment proceedings against Judge Goodman, and the Legislature itself has previously acknowledged this. The House Impeachment Committee that

---

[2] Kentucky Revised Statute.

oversaw the proceedings against former Kentucky Attorney General Daniel Cameron stated in its report recommending that no further action be taken that the petition "[failed] to satisfy the requirements of KRS 63.030(1)" and could therefore be dismissed.[3]  The Committee went on to say that "[t]he Petition's shortcomings are not just technical violations: they disregard the safeguards that ensure that impeachment is fair to the accused and comports with the rule of law."  This Court could not agree more.

## 2) The facially invalid petition for impeachment did not allege that Judge Goodman committed any impeachable offenses.  The allegations of misconduct should have instead been addressed solely by the Judicial Conduct Commission.

Kentucky's Constitution explicitly states that "[t]he Governor and all civil officers[4] shall be liable to impeachment for any misdemeanors in office[.]"  Ky. Const. § 68.  However, it also provides that

> Subject to rules of procedure to be established by the Supreme Court, and after notice and hearing, any justice of the Supreme Court or judge of the Court of Appeals, Circuit Court or District Court may be retired for disability or suspended without pay or removed for good cause by a commission composed of one judge of the Court of Appeals, selected by that court, one circuit judge and one district judge selected by a majority vote of the circuit judges and district judges, respectively, one member of the bar appointed by its governing body, and two persons, not members of the bench or bar, appointed by the Governor.  The commission shall be a

---

[3]*The Impeachment Committee's Report and Recommendation that No Further Action be Taken Concerning the Impeachment of Attorney General Daniel Cameron* (2021), https://apps.legislature.ky.gov/CommitteeDocuments/343/13227/Committee%20Report%20and%20Recommendation%20-%20AG%20Daniel%20Cameron.pdf.

[4] Because the petition and charge are not constitutionally sound, we are not analyzing whether elected judges are civil officers under Section 68.  We note that typically civil officers are appointed officials and not elected.

state body whose members shall hold office for four-year terms. Its actions shall be subject to judicial review by the Supreme Court.

Ky. Const. § 121. The commission referred to by Section 121 is colloquially referred to as the Judicial Conduct Commission (JCC). As impeachment proceedings by the Legislature and judge removal proceedings by the JCC are both provided for by our Constitution, impeachment proceedings do not have inherent precedence over JCC proceedings. The question before us is accordingly whether the Legislature's actions in entertaining the impeachment petition against Judge Goodman violated the separation of powers doctrine by intruding on the Judicial Branch's authority to address the specific allegations of misconduct levied against her therein.

The Legislature itself has stated that impeachment is a "tool to remove from office public officials who act with true perfidy—far outside the bounds of decency or sound government."[5] A review of the unsworn allegations contained in the facially invalid impeachment petition against Judge Goodman demonstrates that no allegation of misconduct rose to this extreme level of misconduct. The allegations were therefore inappropriate for review by the Legislature as "misdemeanors in office" and should have instead been addressed via the well-established appellate process and constitutionally

---

[5] *Order Dismissing Petition to Impeach* (2021), https://apps.legislature.ky.gov/CommitteeDocuments/343/13227/Rep.%20Goforth%20Petition%20Dismissal.pdf. We note that this order was signed by the Committee's Chairman, Rep. Jason Nemes.

7

provided judicial discipline proceedings within the Judicial Branch. Briefly

stated, the impeachment petition alleged the following:

1) In *Commonwealth v. Cornell Denmark Thomas, II*, 21-CR-00336, Judge Goodman dismissed an indictment of one count of murder and one count of leaving the scene of an accident involving a death. This ruling was later reversed by the Court of Appeals.

2) In *Commonwealth v. Domonick Donte Jones*, 23-CR-00394, Judge Goodman ignored the Commonwealth's recommended sentence of five years' imprisonment and sentenced the defendant to probation. This ruling was later reversed by the Court of Appeals.

3) In *Commonwealth v. James Harvey Hendron*, 18-CR-01084, Judge Goodman reversed a jury conviction based on a finding of prosecutorial misconduct. This ruling was later reversed by the Court of Appeals.

4) In *Gregory Simpson v. Abigail Caudill, Warden*, 23-CR-02878, Judge Goodman released an individual from prison who still had twenty-one years remaining on a forty-two-year sentence. This ruling was later reversed by the Court of Appeals.

5) In *Kenneth Ain, MD v. University of Kentucky*, 23-CI-03018, Judge Goodman refused to recuse herself. This Court later granted a motion to disqualify her under KRS 26A.015.

6) In *Caitlin Huff, et al. v. University of Kentucky, et al.*, 23-CI-01684, Judge Goodman found that the University of Kentucky was not entitled to be dismissed from the suit on the basis of sovereign or governmental immunity. This ruling was later reversed by the Court of Appeals.

At bottom, each of the allegations against Judge Goodman for the

foregoing actions stemmed from a disagreement regarding the manner in which

she exercised her constitutional authority as a circuit court judge to decide

justiciable cases brought before her. Ky. Const. § 112. If there is a

disagreement over the exercise of that authority, a litigant has the right to an

appeal, Ky. Const. § 115, and either this Court or the Court of Appeals will

8

have exclusive jurisdiction over that appeal. Ky. Const. §§ 110, 111. Indeed, in five out of the six cases mentioned above Judge Goodman's erroneous actions were corrected via the appellate process, and in the remaining case her refusal to recuse was corrected by this Court's KRS Chapter 26A oversight. But, crucially, an individual's disagreement with a judge's ruling, or even the fact that a judge's ruling has been deemed an abuse of discretion by an appellate court (no matter how scathingly), does not and cannot constitute a misdemeanor in office.

Judges must remain free to exercise the constitutional authority bestowed upon them by the electorate to decide the cases and controversies before them without fear that a legally incorrect ruling or even an appellate finding of abuse of discretion will result in the extreme sanction of impeachment. As the United States Supreme Court has explained:

> Few doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction. . . This immunity applies even when the judge is accused of acting maliciously and corruptly, and it is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences.

*Pierson v. Ray*, 386 U.S. 547, 553–54 (1967) (internal quotation marks omitted).

Moreover, if an individual believes that a judge's incompetence is sufficiently gross and persistent so as to constitute misconduct, that individual should not seek redress with the Legislature except in the most extraordinary of circumstances. As noted, the JCC is the entity endowed with the

9

constitutional authority to have a sitting judge "removed for good cause[.]" Ky. Const. § 121. And the JCC and this Court are the only two entities that have the authority to opine on whether a judge has violated the Code of Judicial Conduct.[6] Notably, the JCC is currently conducting proceedings to consider whether Judge Goodman's conduct warrants action. Available sanctions in JCC proceedings range from a private reprimand to removal from office.

Historically, when judges were appointed in Kentucky, there were two methods of removal of judges who violate either the law criminally or by violation of the Code of Judicial Conduct. Prior to 1976, judges could be removed by either impeachment or removal by address of the Legislature. *See* Shawn D. Chapman, *Removing Recalcitrant County Clerks in Kentucky*, 105 Ky. L.J. 261, 299 (2017). Although it must be observed that *never* in the history of this Commonwealth's 233 years of statehood has a judge been removed from office via impeachment. Provisions for removal of judges by address by the legislature by a vote of two-thirds of both Houses of the General Assembly were originally included in all four of Kentucky's Constitutions. *Id.* at 301. While the power of removal by address was initially directed at causes for which impeachment would have been improper, it was later permitted "for any

---

[6] The JCC has acted to remove judges on multiple occasions and this Court has upheld their removal in *Jameson v. Judicial Conduct Comm'n*, 701 S.W.3d 236 (Ky. 2024); *Gordon v. Judicial Conduct Comm'n*, 655 S.W.3d 167 (Ky. 2022); *Gentry v. Judicial Conduct Comm'n*, 612 S.W.3d 832 (Ky. 2020); *Alred v. Commonwealth, Judicial Conduct Comm'n*, 395 S.W.3d 417 (Ky. 2012); *Starnes v. Judicial Ret. & Removal Comm'n*, 680 S.W.2d 922 (Ky. 1984); and *Wilson v. Judicial Ret. & Removal Comm'n*, 673 S.W.2d 426 (Ky. 1984).

reasonable cause." *Id.* at 302 (quoting Ky. Const. of 1850, art. IV, § 3; Ky. Const. § 117 (repealed 1976)).

In Kentucky, removal by address "with its requirement of the support of two-thirds of both houses, has like impeachment been too politically difficult to carry out very often."[7]  *Id.* at 303. "This difficulty is what led to the Old Court-New Court crisis of 1824 to 1826 in which the General Assembly failed to remove judges from the Court of Appeals and, instead, tried to repeal the court and create a new one." *Id.* at 304.  This crisis stemmed from a three judge Court of Appeals panel affirming two trial court decisions that struck down a popular debt-relief act, the result of which was public outcry and the initiation of removal proceedings. *Id.*  Thus, although the General Assembly was unable to remove the judges by address, it was nevertheless able to cause judicial chaos in Kentucky for two years, as two different courts claimed to be the court of last resort during that period.  *Id.* at 305.  As here, the "Old Court-New Court" petitions were based on the dislike and/or disagreement of the day-to-day work within the courtroom.

Regardless, the option for removal by address remained extant in Kentucky until it was "*removed* when the Judicial Article was adopted in 1975 and *replaced by* a Retirement and Removal Commission[,]" now referred to as the JCC.  *Id.* at 312 (citing Ky. Const. § 121) (emphasis added).  The

---

[7] We do note however that "in the more than 200 years of Kentucky's existence, despite several attempts, only two higher-court judges. . . have been successfully removed by address." *Id.* at 305-06.  Those judges were William H. Burns and Joshua F. Bullitt, "both of whom were accused of being Confederate sympathizers." *Id.* at 306.

11

Legislature's current attempt to impeach a sitting judge based on behavior that clearly does not rise to the level of a misdemeanor in office is a thinly veiled and unconstitutional attempt to revive the practice of removal by address.

To be clear, we do not herein conclude that the Legislature can *never* impeach a sitting judge. *Commonwealth v. Tartar*, 239 S.W.2d 265, 267 (Ky. 1951) ("The Constitution (Section 68), and the statute (K.R.S. 63.030), provide for the impeachment of officers, which would include judges[.]"); *accord Jameson v. Judicial Conduct Comm'n,* 701 S.W.3d 236, 283 (Ky. 2024). Nor do we hold that JCC proceedings and impeachment proceedings, under the right factual circumstances, are mutually exclusive. But we do conclude that it is only the rarest of circumstances in which a sitting judge has committed either an actual, indictable crime or an offense in office constituting the most reprehensible moral turpitude that the Legislature is permitted to veer into the judge removal lane which is, under most circumstances, reserved solely for the Judiciary. Those circumstances simply are not present in this case and the Legislature has consequently intruded on the authority of both this Court, the Judicial Branch at large, and the constitutionally empowered Judicial Conduct Commission in entertaining impeachment proceedings against a sitting judge based solely on rulings that, right or wrong, were within her discretion to make.

**3) The impeachment hearing did not afford Judge Goodman due process.**

As noted, the entire basis of the facially invalid petition for impeachment concerned Judge Goodman's actions and rulings in six cases over which she

12

presided. But, at the time of the House Impeachment Committee's hearing against her, five of those cases remained active. This included the three cases that were the primary focus of the impeachment hearing. As impeachment hearings are public proceedings, Judge Goodman was unable to explain or defend any of the actions she took in those cases without running afoul of SCR[8] 4.300(2.10)(A)("A judge shall not make any public statement that might reasonably be expected to affect the outcome or impair the fairness of a matter pending* or impending* in any court[.]").

Judge Goodman's inability to defend herself by providing any explanation for her actions does not comport with procedural due process. "At its most basic level, procedural due process ensures that one is not unfairly deprived of his life, liberty, or property without receiving a hearing, adequate notice, and a neutral adjudicator." *White v. Boards-Bey*, 426 S.W.3d 569, 574 (Ky. 2014). While she received notice, a hearing, and what we must presume were neutral adjudicators, she was forced by her obligations under the Judicial Code of Conduct to stand silent rather than attempt to defend her actions or thought processes in taking those actions. This is yet another reason these misconduct allegations, which fall short of criminal acts, immoral behavior, or high moral turpitude, can only be handled by the JCC.

---

[8] Kentucky Supreme Court Rule.

13

**4) Judge Goodman would face irreparable harm in the absence of this writ.**

Finally, although our typical standards for the issuance of a writ do not apply to the question of whether to issue a supervisory writ, we note that Judge Goodman faces irreparable harm in the absence of the relief she requests herein. *See, e.g., Ex parte Smith*, 664 S.W.3d 505, 507 (Ky. 2022) ("The standard 'is very simply whether a majority of this Court believes the circumstances merit a supervisory writ.'"). If impeached, Judge Goodman will be removed from office; she will be disqualified from ever holding any office of honor, trust, or profit in the Commonwealth again; and she will be stripped of the retirement benefits she has accrued over her nearly twenty years of service to the Commonwealth. All of this will occur, and yet there exists no means by which she may appeal her impeachment. This is the textbook definition of harm that is irreparable.

**5) This matter does not present a non-justiciable political question.**

The political question doctrine, which is primarily grounded in the separation of powers doctrine, states that "the judicial department should not interfere in the exercise by another department of a discretion that is committed by a textually demonstrable provision of the Constitution to the other department, or seek to resolve an issue for which it lacks judicially discoverable and manageable standards[.]" *Fletcher v. Commonwealth*, 163 S.W.3d 852, 860 (Ky. 2005) (citing *Baker v. Carr*, 369 U.S. 186, 210 (1962); *Powell v. McCormack*, 395 U.S. 486, 518 (1969); *Vieth v. Jubelirer*, 541 U.S. 267, 276 (2004)).

14

Yet while the separation of powers bars our consideration of unduly political questions, *it also unquestionably assigns to us the solemn duty of ensuring that the legislative and executive departments do not violate our Kentucky Constitution, even in the exercise of functions or discretion falling within their exclusive domains.* . . [A] claim that an act of government is unconstitutional presents a purely judicial question appropriate for resolution by the judiciary. . . Indeed, our Constitution itself commands that each Justice and Judge of this Commonwealth solemnly swear or affirm before taking office that he or she will "support ... the Constitution of this Commonwealth." Ky. Const. § 228.

*Graham v. Adams*, 684 S.W.3d 663, 679 (Ky. 2023) (emphasis added).

The Attorney General asserts that Ky. Const. § 109 "commands the judiciary to stay out of impeachments[,]" and that this alleged commandment renders Judge Goodman's claims against the proceedings against her non-justiciable political questions. Section 109 states in its entirety:

The judicial power of the Commonwealth shall be vested exclusively in one Court of Justice which shall be divided into a Supreme Court, a Court of Appeals, a trial court of general jurisdiction known as the Circuit Court and a trial court of limited jurisdiction known as the District Court. The court shall constitute a unified judicial system for operation and administration. The impeachment powers of the General Assembly shall remain inviolate.

In context, this Section discusses the powers of the judiciary and then makes an unequivocal statement that the "impeachment powers of the General Assembly shall remain inviolate." This simply means that the power to impeach belongs to the Legislature alone, and we have remained faithful to that mandate long before this matter arose. *See Jameson*, 701 S.W.3d at 283 ("While this Commonwealth's Constitution grants the JCC the authority to retire, suspend, or remove a judge, it places the authority to impeach an elected official solely in the hands of the legislature[.]").

15

Despite the argument to the contrary, Section 109 does *not* mean that the Legislature has the unfettered authority to conduct unconstitutional impeachment proceedings based on the mundane, discretionary actions of a judge that are within the exclusive authority of *this* branch to address. Kentucky's Constitution contemplates *co-equal* branches of government. Yet the Respondents would have us interpret it (or more to the point, *not* interpret it) such that the Legislature may have the complete, unchecked power to impeach judicial branch officials for matters which our Constitution gives *this* branch the authority to address. This would not be co-equal. It would not be constitutional. It would be tyrannical.

Simply put: "The issue presented by this case is a constitutional issue, not a political one; thus, it is justiciable." *Fletcher v. Commonwealth*, 163 S.W.3d 852, 860 (Ky. 2005) (citing *Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186, 209 (Ky. 1989) ("To allow the General Assembly. . .to decide whether its actions are constitutional is literally unthinkable.")).

Based on the foregoing, the Court ORDERS that:

1. Judge Goodman's petition for a supervisory writ under Section 110(2)(a) of the Kentucky Constitution is GRANTED;

2. Judge Goodman's motion for a declaration that H.R. 124 encroaches upon the inherent powers of the Judicial Branch and violates the Separation of Powers Doctrine is GRANTED;

3. Judge Goodman's motion for a declaration that H.R. 124 violated due process of law is GRANTED;

4. Judge Goodman's motion to declare H.R. 124 and the Articles of Impeachment against her void *ab initio* is GRANTED; and

5. The General Assembly is hereby ENJOINED from further impeachment proceedings against Judge Goodman and is ORDERED to dismiss the current impeachment proceedings against her.

Lambert, C.J.; Bisig, Conley, Keller, Nickell and Thompson, JJ., sitting. Bisig, Conley, Keller, and Thompson, JJ., concur. Thompson, J., also concurs by separate opinion. Nickell, J., dissents by separate opinion. Goodwine, J., not sitting.

THOMPSON, J., CONCURRING BY SEPARATE OPINION: I respectfully concur with the majority's very well written and thorough analysis. The legislature has from the inception of our Commonwealth had the power to impeach enshrined in each iteration of our constitution. It is specifically empowered to impeach by Sections 66-68 of our current constitution. The power to impeach is not the question here. The question is what misconduct by an elected official constitutes an impeachable offense.

The will of the people in an election to freely choose their elected officials should not be lightly overturned through impeachment by the House and conviction by the Senate. Rarely should the impeachment power be needed; it only should be exercised for official misconduct, termed by Section 68 a "misdemeanor in office."

Officials cannot be impeached for a traffic ticket. They cannot be impeached based on a political disagreement or an unpopular decision. They

17

cannot be impeached because they have blue eyes. They can only be

impeached for criminal conduct that occurs during their term of office.[9]

In our role in interpreting the Constitution, it is important that we

provide guidance to the General Assembly as to how it can properly exercise its

impeachment power while complying with our constitution. I also write

separately to highlight my concerns with the unwarranted use of impeachment

to intimidate and stifle the judiciary's independence, which the majority has

been too diplomatic and judicious to address as unequivocally as the

seriousness of this constitutional moment demands.

## I. IT IS THE SOLE RESPONSIBILITY OF THE SUPREME COURT OF KENTUCKY TO INTERPRET THE CONSTITUTION OF KENTUCKY.

The Kentucky Supreme Court is uniquely vested with the exclusive

power to interpret our Kentucky Constitution. Each state has its own

constitution, and each state supreme court is responsible for interpreting its

own constitutional language about what constitutes an impeachable offense.

This is nothing new or controversial. This is well-settled law. It has been

the duty of our highest court since the beginning of our Commonwealth to act

as the interpreter of our Kentucky Constitution. *See Superintendent of Pub.*

*Instruction v. Auditor of Pub. Accounts,* 97 Ky. 180, 30 S.W. 404, 404 (1895);

*Miller v. Johnson,* 92 Ky. 589, 18 S.W. 522, 524 (1892).

> The judiciary has the ultimate power, and the duty, to apply,
> interpret, define, construe all words, phrases, sentences and
> sections of the Kentucky Constitution as necessitated by the

---

[9] Based on the final clause of Section 68, there is no requirement that such criminal conduct be prosecuted prior to the impeachment.

controversies before it. It is *solely* the function of the judiciary to so do. This duty must be exercised even when such action serves as a check on the activities of another branch of government or when the court's view of the constitution is contrary to that of other branches, or even that of the public.

*Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186, 209 (Ky. 1989).

All of the Kentucky Constitutions have provided for the existence of a third equal branch of government, the judiciary. It is not for laymen to be the interpreters of the Kentucky Constitution, but for the judiciary to do so as "useful and honored servants of the public, for whose welfare, after all, we interpret the constitution and the laws." *Whitaker v. Green River Coal Co.*, 276 Ky. 43, 122 S.W.2d 1012, 1016 (1938). "To allow the General Assembly . . . to decide whether its actions are constitutional is literally unthinkable." *Rose*, 790 S.W.2d at 209.

The dissent focuses on the interpretation given to the federal constitution and urges that we follow the same path. Respectfully, we are not controlled by the U.S. Supreme Court's interpretation of the impeachment power contained in Article II, Section 4 of the U.S. Constitution.

"[W]hen interpreting our own Kentucky Constitution, this Court is not tethered to the decisions of the U.S. Supreme Court or the reasoning upon which those decisions are founded." *Parker v. Commonwealth*, 440 S.W.3d 381, 388 (Ky. 2014). "[U]nder our system of dual sovereignty, it is our responsibility to interpret and apply our state constitution independently." *Commonwealth v. Wasson*, 842 S.W.2d 487, 492 (Ky. 1992), *overruled on equal protection grounds by, Calloway Cnty. Sheriff's Dep't v. Woodall*, 607 S.W.3d 557 (Ky. 2020). That

19

even includes our right to interpret the same words in our constitution differently than federal interpretations. *See, e.g., Lasher v. Commonwealth ex rel. Matthews*, 418 S.W.2d 416, 418 (Ky. 1967).[10] Our system is our own and our judgment is our own, in interpreting our constitution.

## II. THE KENTUCKY CONSTITUTION, BASED ON ITS UNIQUE PROVISIONS, LIMITS THE IMPEACHMENT POWER TO CRIMES OF MORAL TURPITUDE AND VESTS LOWER LEVELS OF DISCIPLINE IN THE JUDICIAL CONDUCT COMMISSION.

In Kentucky, we interpret constitutional provisions "according to what was said[,]" giving "the words employed therein . . . the meaning and significance that they possessed at the time they were employed[.]" *Commonwealth v. Claycomb ex rel. Claycomb*, 566 S.W.3d 202, 215 (Ky. 2018) (quoting from *Pardue v. Miller,* 306 Ky. 110, 206 S.W.2d 75, 78 (1947), and *City of Lexington v. Thompson,* 250 Ky. 96, 61 S.W.2d 1092, 1096 (1933)). There is no better source in determining the meaning of the words "misdemeanor in office" than how the impeachment power has been used since our founding, as evidenced by the examples of who has been impeached.

"Misdemeanor" in Kentucky has long meant a crime. It is an absolute floor in defining impeachable offenses. This includes higher crimes. Typically, impeachment has been used to remove the "worst of the worst" who were committing very serious crimes while in office. This category includes Treasurer

---

[10] Explaining "the fact that the federal government or the federal courts may designate or classify mail carriers as officers is not controlling of our interpretation of our Constitution. What 'office' means in Section 237 should be decided according to the standard Kentucky meaning of the word as established by the decisions of this court."

"Honest" John Tate who stole about $200,000 of the treasury's money and absconded with it, and Commonwealth Attorney Ron Goldy who used his office to solicit sexual favors. His conduct, at minimum, qualified as a misdemeanor in office.

In considering this issue, I am guided by the language of the impeachment sections, other fundamental provisions of our constitution, how the Judicial Article altered our constitution, and how "misdemeanor in office" has always been treated by the legislature prior to this year. The Kentucky Constitution is fundamentally different from the U.S. Constitution; there is no reason therefore to interpret Kentucky's constitution in lock-step with the U.S. Constitution when our impeachment provisions differ significantly, as does our constitution as a whole.

"[I]n construing one section of a Constitution a court should not isolate it from other sections, but all the sections bearing on any particular subject should be brought into consideration and be so interpreted as to effectuate the whole purpose of the Constitution." *Grantz v. Grauman,* 302 S.W.2d 364, 366 (Ky. 1957). Therefore, we must consider all relevant sections in interpreting the meaning of those words and what power is reserved to the General Assembly over impeachment as compared with the judiciary for judicial discipline.

It is significant that the Kentucky Constitution has a strong separation of powers between the branches of our government, which supports judicial independence, in Sections 27 and 28.[11]

> Our constitution is unique in that it contains "explicit provisions which, on the one hand, *mandate* separation among the three branches of government, and on the other hand, specifically *prohibit* incursion of one branch of government into the powers and functions of the others." *Legis. Rsch. Comm'n By and Through Prather v. Brown*, 664 S.W.2d 907, 912 (Ky. 1984). **Taken together, those provisions, Kentucky Constitution §§ 27 and 28, have long functioned to "preclude the exercise of arbitrary power[ ]" by one branch of government** that erroneously wields the power of another. *Commonwealth ex rel. Beshear v. Bevin*, 575 S.W.3d 673 (Ky. 2019) (quoting *Fletcher v. Commonwealth*, 163 S.W.3d 852, 863 (Ky. 2005)). This Court has been constitutionally entrusted with the judicial power, and duty, to determine when such exercises abridge the constitutional separation of powers. Ky. Const. § 109. In doing so, this Court has previously determined the separation of powers must be "strictly construed." *Brown*, 664 S.W.2d at 912 (quoting *Arnett v. Meredith*, 275 Ky. 223, 121 S.W.2d 36, 38 (1938)).

*Conn v. Ky. Parole Bd.*, 701 S.W.3d 76, 85 (Ky. 2024) (emphasis added).[12]

---

[11] Section 27 provides: "The powers of the government of the Commonwealth of Kentucky shall be divided into three distinct departments, and each of them be confined to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another." Ky. Const. 27. Section 28 provides: "No person or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted." Ky. Const. 28.

[12] "Collectively, Sections 27 and 28 create a double-barreled, positive-negative approach. One part of the doctrine grants powers to the three branches, while the other part specifically prohibit incursion of one branch into the functions and powers of the others. In light of the broad power afforded to the three branches, this increased protection is essential to ensuring that the branches only act within their limits." Andrew Wilhoit, *Improper Means to A Kalopsian End: An Analysis of Medical Review Panels Under Kentucky's Constitution*, 57 U. Louisville L. Rev. 439, 446 (2019) (internal quotation marks and footnotes omitted). *See also* Paul E. Salamanca, *The Constitutionality of an Executive Spending Plan*, 92 Ky. L.J. 149, 178 n. 36 (2004).

I do not discount that impeachment is a power granted to the legislature. However, as I have noted above, it is solely our responsibility as the Supreme Court to interpret our constitution and not the role of the General Assembly.

Our Court's power has been expanded through the Judicial Article, which came into effect in 1976 and spans Sections 109 to 143. Section 121 gives us the power to police the conduct of our judges, through a disciplinary body. This section provides that all judges "may be retired for disability or suspended without pay or removed for good cause by a commission[.]" Ky. Const. 121.  This role is currently fulfilled by the Judicial Conduct Commission (JCC). This is a unique power which has no equivalent section in the federal constitution.

The conduct regulated under Section 121 is specified in our Code of Judicial Conduct. *See* Supreme Court Rules (SCR) 4.300 (Canons 1-4). This disciplinary system can act to discipline judges who violate our canons. This can include criminal behavior, but typically involves any violation of ethical responsibilities. If a judge is deliberately flouting precedent or purposely treating parties unfairly, the JCC is well equipped to address such matters and correct them.

The JCC works vigorously to address complaints against judges. The JCC, whose decisions are subject to review by our Court, has not hesitated to discipline and even remove judges where appropriate. We have not hesitated to uphold its rulings where appropriate.

The JCC has exclusive jurisdiction to discipline judges for unethical conduct which does not rise to the level of an impeachable offense. Additionally, judges, as members of the Kentucky Bar Association (KBA), are also subject to KBA discipline, which can include disbarment.

As for judicial decisions, those are subject to correction on appeal, as set out in Sections 110(2), 111(2), 112(5), and 115. Parties have a constitutional right to at least one level of appellate review. Judicial errors are appropriately addressed through the appellate process.

Undoubtedly, it was intended that the Judicial Article, with its adoption of Section 121 which resulted in the JCC, would not eliminate the impeachment power from the legislative branch. This is evident from the last sentence of Section 109 which states: "The impeachment powers of the General Assembly shall remain inviolate."

However, I conclude in looking at our robust separation of powers clauses and the Judicial Article as a whole, that after the adoption of Section 121, the legislature's Section 68 impeachment power is limited in its reach over the judiciary. By necessary implication, vesting the discipline for ordinary judicial misconduct in the JCC removed such conduct from discipline through the impeachment process. While there certainly may be an overlap in the responsibilities of the JCC and the legislature when it comes to misconduct that is serious enough to qualify as a crime in office, more minor matters remain in the exclusive jurisdiction of the JCC.

Additionally, I base this conclusion on the wording of Section 124, which states in relevant part: "Any remaining sections of the Constitution of Kentucky as it existed prior to the effective date of this amendment **which are in <u>conflict</u> with the provisions of amended Sections 110 through 125 <u>are repealed to the extent of the conflict</u>**[.]" Ky. Const. 124 (emphasis added).

So, what does "misdemeanor in office" mean? It is our responsibility as the Supreme Court to define the reach of this phrase to provide appropriate limits on the impeachment power based on this language. There is very little judicial interpretation by the Kentucky judiciary about what the phrase "misdemeanor in office" means because **all previous impeachments in the history of the Commonwealth were for serious criminal behavior**.[13]

I find my answer in examining what situations have historically merited impeachment. Even if the impeachment power granted in the constitution remains exactly the same as it was from its inception in our first constitution, the impeachment power was meant to be exercised extremely judiciously for only serious crimes of moral turpitude involving the official's conduct in office based on its infrequent use and the gravity of the historical circumstances that warranted it.

---

[13] There are Kentucky opinions which contain brief references to the meaning to be given to the phrase "misdemeanor in office." These opinions equate "misdemeanor in office" to "misbehavior," "misfeasance," or "official misconduct," but these terms are also largely undefined and such definitions are at best only dicta. *See Commonwealth v. Tartar*, 239 S.W.2d 265, 266-67 (Ky. 1951) (misfeasance); *Standeford v. Wingate*, 63 Ky. 440, 464-65 (1866) (Williams, J. dissenting) (official misconduct); *Page v. Hardin*, 47 Ky. 648, 673 (1848) (misbehavior). *See also* Black's Law Dictionary (12th Ed, 2024) (definitions for "misdemeanor in office," "misfeasance in public office," and "official misconduct").

The following examples illustrate the grave and criminal conduct required for impeachment. Judge Benjamin Sebastian was impeached in 1806 after secretly accepting an annual pension of $2,000 from the Spanish government while serving as a judge. The Report of the Select Committee (1806). Sebastian resigned before conviction. Essentially the proof that he was receiving this pension established that Sebastian had compromised Kentucky's sovereignty with treasonous behavior. Sebastian was a participant in a Spanish conspiracy. "He participated in the intrigues with Spain to break Kentucky and the western country away from the United States (1796); received a pension from Spain; and resigned his judgeship after public disclosure of his Spanish ties (1806)."[14]

Treasurer James Tate was impeached in 1888 and convicted by the Senate for abandoning his office, fleeing the state and being a fugitive from justice after embezzling "willfully and feloniously . . . in violation of the Constitution and of his duties and oaths of office, misapply and convert, take and divert" nearly $200,000 from the treasury of "public moneys" and unlawfully loaned treasury money to "divers and sundry persons[.]" Senate Journal, 1048-51 (1888).

In 1916, Judge J. E. Williams was impeached for "corrupt misconduct and misdemeanors in office." Among the charges was the criminal conduct of

---

[14] *See* Summary of the Benjamin Sebastian papers, available at https://indianahistory.org/wp-content/uploads/benjamin-sebastian-papers-1795-1807.pdf

26

false arrest for issuing multiple arrest warrants for felonies without any basis either from sworn affidavits or having any personal knowledge that crimes had been committed against two different groups of people on two different occasions, resulting in multiple people being jailed without cause; taking a bribe of $1 to release someone from jail; and jury tampering in three cases by selecting a hand-picked group of people to be empaneled on a jury who would be against the defendants. Journal of the Senate of Kentucky 10-24 (1916). Williams was acquitted after a trial before the Senate. *Id.* at 69-80. These are the most striking examples of the types of crimes which justified impeachment prior to the Judicial Article taking effect.[15]

After these impeachments, the legislature did not deem any conduct worthy of impeachment until 1991, after Commissioner Ward Burnette was criminally convicted of felony theft for falsifying timesheets. He was impeached for a "theft of funds belonging to the Commonwealth of Kentucky[.]" Burnette resigned before trial in the Senate.

The 2023 impeachment of Commonwealth's Attorney Ronnie Goldy, who used the power of his office to solicit sexual favors from a defendant (nude

---

[15] There have been additional impeachments in Kentucky, but limited information is available about most, only from brief mentions in secondary sources: (1) 1801, Elijah Craig a Justice of the Peace in Gallatin County who was not convicted in the Senate; (2) 1803, Thomas Jones, a surveyor in Bourbon County was impeached on numerous counts including overcharging the Commonwealth for surveying work (which could certainly qualify as some kind of crime), failure to perform his duties, and surveying the wrong tracts of land; he was convicted of five of twenty-two charges; (3) 1808, William C. Rogers, a surveyor in Livingston County who was acquitted in the Senate; and (4) 1847, Surveyor John Duff was impeached and convicted for failing to post a statutory bond for five years—a misdemeanor under Kentucky law—and accused of extortion and corrupt surveying.

photos and explicit videos) in exchange for preferential treatment during her prosecution, was of course a proper subject for use of the House's impeachment power. Pursuing impeachment under these circumstances was entirely in keeping with Kentucky's longstanding history of using its impeachment power judiciously to remove from office those individuals who commit crimes while in office.

These episodes share a common thread: intentional corruption or serious abuses of office—treason, theft, extortion, falsification.

A principled standard emerges from these historical examples. An impeachable offense in Kentucky must consist of intentional, corrupt, or gravely abusive conduct that directly injures the Commonwealth or irreparably breaches the public trust—demonstrated by clear evidence comparable in seriousness to historical instances of impeachment. Mere disagreement over policy, mistaken judgment, negligence, or isolated illegality does not satisfy that threshold.

Applying this standard, impeachment lies only where the record demonstrates knowing, substantial misconduct—corruption, fraud, extortion, falsification, or comparable perfidy—not where officials make contested policy choices, communicate imperfectly under pressure, belong to political organizations, or file amicus briefs in matters of federalism.

Throughout the history of Kentucky, less than a dozen officers have been impeached. This sparse number of impeachments has suddenly changed. Five impeachment petitions were filed in 2026. Pursuing impeachment proceedings

28

against judges based on disagreeing with their legal decisions is a perversion of the impeachment power and a power-grab that threatens the judicial branch and its independence through intimidation.

Legal disagreements are not impeachable, as the House Committee on Impeachment recognized in 2021 in examining whether Governor Beshear or Attorney General Cameron should be impeached and ultimately dismissing the petitions against them.[16] The impeachment committee report regarding the petition to impeach Governor Beshear tellingly notes that impeachment is intended solely for "serious abuses by public officials—not disagreement about exercises of official discretion." Committee Report—Beshear, 7. The committee's analysis reflects longstanding consensus: impeachment is not designed to correct legal error, policy disagreements, or isolated instances of statutory overreach. Rather, impeachment is reserved for conduct so serious that it undermines the functioning of government itself. Kentucky's sparse history of impeachment—only eight proceedings in over two centuries—illustrates that the remedy is intended for the gravest violations. *Id.* at 6-7. This rarity underscores the constitutional design: impeachment must remain "a very high hurdle." *Id.* at 18.[17]

---

[16] These full reports and other materials are available online at https://apps.legislature.ky.gov/CommitteeDocuments/343/.

[17] The committee found the petitioners' allegations failed to meet this high standard because they repeatedly conflated disagreement with the Governor's policy decisions with evidence of serious abuse of power. The committee recognized that using impeachment as a mechanism to relitigate complex constitutional disputes would destabilize the separation of powers. "Impeachment overturns the election of the accused; its abuse is itself anti-democratic. It must not be allowed to settle scores or relitigate policy disputes." *Id.* at 18-19. The impeachment committee noted that if a

Similarly, as to Attorney General Cameron, the impeachment committee explained that the Constitution is designed with an intentionally substantial standard for conduct to be impeachable, "requiring a high bar for impeachment of a public officer—a true showing of perfidy, not a political or policy disagreement." Committee Report—Cameron, 2.[18]

For more than two centuries, Kentucky has treated impeachment as a narrow safeguard against egregious crimes, not as a ready instrument of partisan contest or policy review. Fidelity to that tradition—and to our Constitution—requires a high, exacting threshold: intentional, corrupt, or gravely abusive misconduct that injures the Commonwealth or irreparably breaches the public trust. Anything less invites the very abuses the Framers feared.

The impeachment committee took the position that "misdemeanor in office" is defined as "anything a majority of the members of the House say it is." Such an interpretation is tantamount to granting the legislature "king-like" powers rather than acknowledging that the Constitution constrains us all.

I am wholly satisfied that the legislature's impeachment of Judge Goodman is based on an erroneous, indefensible interpretation of the scope of

---

constitutional officer is impeached every time he or she loses in court, impeachment will lead to paralysis. *Id.* at 12.

[18] This high bar is necessary to protect against "the Framers' biggest fear—that impeachment would become a tool for unseating a duly-elected official based on mere policy or political disagreements with the legislature." *Id.* at 2. Thus, impeachment is restricted to public officials who act "far outside the bounds of decency or sound government." *Id.* at 7.

the legislature's impeachment power. Judge Goodman has twenty years of experience on the bench. She has made hundreds of thousands of decisions in resolving cases before her in this time period. During this lengthy career, she has been wrong at some point; all judges are wrong at some point in making their legal rulings. To err is human.

Our judicial system recognizes that errors will happen. We deal with legal errors through the process of appellate review. That process works. The fact that a higher court corrects a lower court does not mean that a judge acted in bad faith. Judges do not all interpret statutes and precedent exactly the same.

As a matter of constitutional interpretation, Judge Goodman's conduct as alleged cannot qualify as a "misdemeanor in office." The allegations against her, even if fully believed, do not establish that she has engaged in a criminal act in office. The legislature would strip us of our power to interpret the Kentucky Constitution and require us to blindly defer to its political judgement.

In the case before us, we should not defer to the legislature's interpretation that a "misdemeanor in office" is whatever the legislature decides it should be. While the legislature may say otherwise, it is evident that Judge Goodman was impeached because the legislature did not agree with her rulings in six cases, rather than that she had committed serious crimes in office. It is troubling that five of the grounds for impeachment in this action were based upon cases which were not even final at that time, having not been resolved by the judicial system. Until cases are finalized by exhausting judicial review, it

cannot yet be determined conclusively whether a trial court's rulings are correct or flawed.

Furthermore, our Code of Judicial Conduct does not allow for the penalization of judges for incorrect rulings made in good faith. SCR 4.020(2); SCR 4.300, Rule 2.2, comment [5]. It is for the JCC and not the legislature to determine if a judge is or is not acting in good faith. It would certainly be appropriate for the JCC to review Judge Goodman's conduct regarding these specific cases after judicial review is concluded.

Even though we are not tethered to the federal interpretation of impeachment as being an unreviewable political question, even some federal justices and judges believe that the impeachment power must have some outer limits such as "if Congress began systematically using impeachments in a blatantly partisan fashion or in a manner utterly devoid of any semblance of a judicial proceeding[.]"[19]

> The trend has been in the direction of at least leaving the door open to judicial review of potential impeachments that might depart so far from due process as to offend the Article III courts' sense of justice. *See Nixon v. United States*, 506 U.S. 224, 246-47 (1993) (White, J., concurring in judgment) ("Were the Senate, for example, to adopt the practice of automatically entering a judgment of conviction whenever articles of impeachment were delivered from the House, it is quite clear that the Senate will have failed to 'try' impeachments."); *id.* at 253-54 (Souter, J., concurring in judgment) ("If the Senate were to act in a manner seriously threatening the integrity of its results, convicting, say, upon a coin toss, or upon a summary determination that an officer of the United States was simply 'a bad guy,' judicial interference might well be appropriate." (citation omitted)); *Claiborne v. U.S. Senate*,

---

[19] Buckner F. Melton, Jr. *Let Me Be Blunt: In Blount, the Senate Never Said That Senators Aren't Impeachable*, 33 Quinnipiac L. Rev. 33, 56 (2014).

No. 86-2780 (D.D.C. Oct. 8, 1986) (dictum) ("I do not mean to suggest that, if a congressional body or member took unusual and extreme actions . . . for example . . . that all black judges were impeached, but not any white judges, that a court could not inquire or even intervene."), *reprinted in* U.S. Congress, Senate, Proceedings of the United States Senate in the Impeachment Trial of Harry E. Claiborne, a Judge of the United States District Court for the District of Nevada, S. Doc. No. 99-48, at 192 (1987).[20]

If even the ostensibly unreviewable "political question" impeachment clause in the U.S. Constitution has some limits, certainly we are free to interpret ours to have much more robust limits given our different constitution and additional protective sections which vested increased responsibility for oversight of judges outside of the legislative impeachment process through our JCC.

### III. TO UPHOLD THE SEPARATION OF POWERS SET OUT IN THE KENTUCKY CONSTITUTION, WE CANNOT ALLOW THE LEGISLATURE TO CONTROL THE JUDICIARY'S RULINGS THROUGH THE THREAT OF IMPEACHMENT.

Our founders in Kentucky believed in the importance of the separation of powers and the independence of the judiciary. Allowing the impeachment of Judge Goodman to go unchecked even though it does not meet the constitutional standards to impeach, would be allowing the legislature to fully control the judiciary.

Our tri-part system from its inception has been regulated with rigorous checks and balances which protect each branch of our government. The legislature's aggressive actions toward the judiciary appear to be an organized

---

[20] *Id.* at 57 n. 88 (case names italicized).

assault on the independence of the judiciary utilizing the legislature as the weapon. We cannot allow the legislature to arbitrarily threaten impeachment based on its dislike of any of our rulings. In 2026, five impeachment petitions were filed, three of them against judges. As to the judges, this resulted in three serious investigations by the impeachment committee, and one impeachment.[21] The question we must ask is: Why is the legislature suddenly using its impeachment power to target judges, not for criminal conduct but for their rulings?

What is clear is that these members of the judiciary had not used their office for unlawful gain or committed any crimes of moral turpitude. Instead, they had the gall to do their job in a manner that reflected their judicial independence, as they should. I can only conclude that the legislature is seeking to intimidate the judiciary into ruling lockstep in its favor by not immediately dismissing frivolous petitions to impeach judges and in fact impeaching judges without adequate cause. This is wholly inappropriate.

Threatening to file inappropriate impeachment proceedings and following through on them to disrupt a tribunal, influence the outcome of a case, and/or to disparage a judge could result in KBA discipline for any lawyers involved if

---

[21] Justice Goodwine was investigated by the impeachment committee after she struck down a statute for violating the Kentucky Constitution after voting to grant rehearing in the matter. She was required to recuse herself from consideration of this case because despite reports that the impeachment committee had determined to dismiss its impeachment investigation against her without impeaching her, the appellees asked for her recusal because an impeachment inquiry against her was still pending.

attorneys take actions in which they are acting in bad faith. *See In re Dusing*, 701 S.W.3d 393, 404 (Ky. 2024); SCR 3.5(d), 3.4(f), and 8.2.

Additionally, such actions can constitute the crime of intimidating a participant in the legal process via use of a threat to influence or attempt to influence that person's "vote, decision, or opinion[.]" Kentucky Revised Statutes (KRS) 524.040(1)(a).[22] This constitutes a Class D felony. KRS 524.040(3).

We cannot let this attack on our branch of government go unchecked. By doing so, the legislature expresses an extreme distrust and hostility to our branch of government and tramples on our judicial independence, a cornerstone of our democratic system.

There will be times that judges are forced to make unpopular rulings to uphold constitutional rights and the rule of law. For example, a trial court may need to grant a motion to suppress, an appellate court may need to reverse a conviction when the right to counsel was violated, and our Court may need to strike down a law which does not comport with our constitution. "Only an independent judiciary can serve the role of trustee to preserve rights that are unpopular in the heat of the moment and to protect individuals who are in the minority."[23] "Judges should be expected to issue neutral and impartial rulings based on the rule of law, regardless of how unpopular those decisions may

---

[22] A judge constitutes a participant in the legal process under the definition in KRS 524.010(3).

[23] Bea Ann Smith, *Alarming Attacks on Judges: Time to Defend Our Constitutional Trustees*, 80 Or. L. Rev. 587, 589 (2001).

be."[24] "[M]ost of us expect courts to uphold the fundamental principles enshrined in the Bill of Rights against the passions and prejudices of the moment. Judges are expected not to gauge public opinion in making their decisions, but rather . . . to decide the legal issues before them 'undisturbed by the clamor of the multitude.'"[25]

> America has valued judicial independence since before the formation of the country. The American Revolution, a fight for national independence, was also a fight for judicial independence. Among the list of grievances justifying the American Revolution, the Declaration of Independence charged King George III with obstructing the administration of justice "by refusing his Assent to Laws for establishing judiciary powers" and with making judges "dependent on his Will alone, for the tenure of their offices, and the amount and payment of their salaries."[26]

The federal founders worried that the legislative branch would "aggrandize itself at the expense of the other two branches." *Buckley v. Valeo,* 424 U.S. 1, 129 (1976).[27]

---

[24] Hon. Barbara J. Pariente & F. James Robinson, Jr., *A New Era for Judicial Retention Elections: The Rise of and Defense Against Unfair Political Attacks*, 68 Fla. L. Rev. 1529, 1533 (2016).

[25] Stephen B. Bright, *Political Attacks on the Judiciary: Can Justice Be Done Amid Efforts to Intimidate and Remove Judges from Office for Unpopular Decisions?*, 72 N.Y.U.L. Rev. 308, 310 (1997) (citing Charles Warren, *The Supreme Court in United States History,* 303 (1923) (quoting Judge William Cranch)).

[26] Shirley S. Abrahamson, *Keynote Address: Thorny Issues and Slippery Slopes: Perspectives on Judicial Independence*, 64 Ohio St. L.J. 3 (2003) (quoting The Declaration of Independence para. 14 and 15 (U.S. 1776)).

[27] Citing M. Farrand, The Records of the Federal Convention of 1787, pp. 74, 76 (1911); The Federalist No. 48, pp. 308-310 (G. P. Putnam's Sons ed. 1908) (J. Madison); The Federalist No. 71, pp. 447-448 (G. P. Putnam's Sons ed. 1908) (A. Hamilton). *See generally* Watson, *Congress Steps Out: A Look at Congressional Control of the Executive,* 63 Calif.L.Rev. 983, 1029-1048 (1975). *See* Shirley S. Abrahamson *Keynote Address: Thorny Issues and Slippery Slopes: Perspectives on Judicial Independence,* 64 Ohio St. L.J. 3, 8 (2003) ("Threats to judicial independence are not new. They have historically come from the executive and legislative branches. The

That warning seems especially prescient in Kentucky today. Like the rest of the country, "[t]o judge from the polemics of the day, judicial independence is beset by enemies upon all sides. A perception of embattled precarity refracts through national political discourse and constitutional jurisprudence alike."[28]

> Safeguarding the role of the state judiciary in a system of separation of powers requires attention to two fundamental concerns. The first is decisional independence—the core function of the judiciary is to resolve disputes impartially, so judges must be insulated from attempts by other institutions to influence their decisions or to affect future rulings by inappropriately punishing them for unpopular decisions. The second concern is the autonomy of the judicial branch. Under the separation-of-powers framework, each branch should be master of its own house, able to deal with intra-branch issues without interference.[29]

An independent judiciary is needed now more than ever. Such a judiciary consists of:

> [J]udges who are free to apply principles of law to the facts of a case without extraneous considerations[,] . . . who can decide difficult and unpopular cases, remaining faithful to the Constitution, without fearing retribution because a decision may not be politically correct. An independent judiciary does not do the bidding for one side or another; it does not cater to Democrats or Republicans; it does not try to please liberals or conservatives or those of other ideological persuasions; it does not abandon constitutional commandments to satisfy the other branches of government. The calling of an independent judiciary is dedication to principles of law—and foremost in that hierarchy is obedience to the Constitution, which, we judges have taken a solemn oath to uphold. In that calling, there is no place for playing politics or

---

legislative or executive branch of government may become unhappy with judicial decisions and try to influence judicial outcomes directly or indirectly.").

[28] Aziz Z. Huq, *Why Judicial Independence Fails*, 115 Nw. U.L. Rev. 1055, 1056 (2021).

[29] *The Courts the Legislature and the Executive: Separate and Equal?*, 87 Judicature 230 (2004).

courting popularity, even with those who have the power to decide the fate of a judge's career.[30]

"Judicial independence stands as a core principle of our constitutional republic."[31] "An independent judiciary, insulated from other political branches, but with power to constrain their freedom of action, is commonly seen as a fundamental element of democracy."[32] "[A]n independent, impartial, and effective judicial system" upholds democratic principles and plays a key "bedrock role" by "facilitating peaceful transfers of power, upholding human rights, and ensuring that the law is applied equally to all people[.]"[33]

The norm is not to impeach judges because of their unpopular judicial rulings.[34] Instead, "[a] judge should [only] be impeached for . . . significant wrongdoing."[35]

---

[30] The Honorable Barry T. Albin, *The Independence of the Judiciary*, 66 Rutgers L. Rev. 455, 455–56 (2014).

[31] Senator Jeff Sessions & Andrew Sigler, *Judicial Independence: Did the Clinton Impeachment Trial Erode the Principle?*, 29 Cumb. L. Rev. 489 (1999).

[32] Jill I. Goldenziel, *Veiled Political Questions: Islamic Dress, Constitutionalism, and the Ascendance of Courts*, 61 Am. J. Comp. L. 1, 2 (2013).

[33] Margaret L. Satterthwaite et. al., *Unchecking Power and Capturing Courts: How Autocratization Erodes Independent Judicial Systems*, 76 Rutgers U.L. Rev. 1147, 1149 (2024); Bea Ann Smith *Alarming Attacks on Judges: Time to Defend Our Constitutional Trustees*, 80 Or. L. Rev. 587 (2001).

[34] Jonathan L. Entin, *Judicial Ethics and Judicial Competence*, 74 Case W. Res. L. Rev. 955, 963–70 (2024) (explaining this is the lesson learned from Justice Samuel Chase being impeached by the House but acquitted by the Senate in 1805, and opining that this norm remains in effect, at least as to United States justices).

[35] Laura R. Porter, *The Necessity of Judicial Independence: Merit-Based Selection for Arkansas's Court of Last Resort*, 68 Ark. L. Rev. 1061, 1076 (2016) (quoting John Lyon, *Unhappy with Ruling on Gay Marriage, Some Want Ability to Recall Judges*, Ark. News (June 22, 2014, 2:00 AM), http://arkansasnews.com/news/arkansas/unhappy-ruling-gay-marriage-some-want-ability-recall-judges [[http://perma.cc/VJ8R-VKWH].

If impeachment to punish unpopular decisions becomes common, judges will face the following dilemma: "whether to make the correct (in his or her professional opinion) but unpopular judicial ruling and potentially unleash the fury of oppositional forces, or to make the popular, but incorrect ruling, and avoid public denunciation."[36] "Causing a judge to be fired [here through impeachment] for an unpopular ruling is obviously an unprincipled political act if the judge followed the rules in making the decision."[37]

Threats to impeach judges have a chilling effect in that they potentially "influence judicial decisionmaking by increasing the personal and professional risks for judges who interpret the law in ways at odds with the majority's preferences."[38] "When criticism of judges rises to the level of political intimidation— . . . by threatening impeachment simply because of an unpopular decision—it undermines the integrity and impartiality of judicial decision making."[39] Attacking judges to coerce them to change their rulings "represent[s] a direct and immediate threat to the independence of the

---

[36] David W. Earley, *When Bathtub Crocodiles Attack: The Timing and Propriety of Campaigning by Judicial Retention Election Candidates*, 68 N.Y.U. Ann. Surv. Am. L. 239, 259 (2012) (footnotes omitted).

[37] James L. Morse, *A Declaration About Judicial Independence*, 20 QLR 731, 738 (2001).

[38] Andrea Specht, *The Government We Deserve? Direct Democracy, Outraged Majorities, and the Decline of Judicial Independence*, 4 U. St. Thomas L.J. 132, 147–48 (2006).

[39] Mark S. Mandell, *Preserving Judicial Independence*, Trial, January 1999, at 9 (1999).

judiciary."[40] "[O]ur judiciary cannot remain truly independent if its judges or justices can be punished for making decisions that are constitutionally correct, but politically unpopular."[41]

## IV. CONCLUSION

The impeachment of Judge Goodman is frivolous and should have been dismissed by the impeachment committee. Instead, the committee recommended charges, and the House voted to impeach Judge Goodman on partisan lines. The legislature erred; however, given our correction which interprets our constitution as to the appropriate definition of impeachable offense in Kentucky, the Senate should dismiss the trial.

NICKELL, J., DISSENTING BY SEPARATE OPINION: Upon addressing the conflicting constitutional arguments and the majority's legal analysis, I am compelled to respectfully dissent as I would deny the petition for a supervisory writ.

"It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). As Andrew Jackson once stated, "[a]ll the rights secured to the citizens under the Constitution are worth nothing, and a mere bubble, except guaranteed to them

---

[40] Vito J. Titone, *The Judiciary As Political Stepping-Stone: The Case for More Temperate Debate*, 12 St. John's J. Legal Comment. 33, 39–40 (1996).

[41] The Honorable Barry T. Albin, *The Independence of the Judiciary*, 66 Rutgers L. Rev. 455, 455 (2014). *See* Monroe H. Freedman, *The Threat to Judicial Independence by Criticism of Judges-A Proposed Solution to the Real Problem*, 25 Hofstra L. Rev. 729, 737–40 (1997) (providing an example in which a judge after being threatened with impeachment changed his rulings to deny a defendant her constitutional rights).

by an independent and virtuous judiciary."  Judicial independence is critical to the preservation of due process under the law and the maintenance of our constitutional republican form of government.  But the bounds of judicial independence are not unfettered, nor are the powers of this Court to restrain perceived infringements upon the authority of the Judicial Branch under the guise of saying "what the law is."

Our Founders prudently recognized that judicial independence—both decisional and institutional—was critical to fairness and impartiality and that the latter was in similar measure central to preservation of a republican form of government, discerning it to be the cornerstone upon which the primal principle of due process of law rested.  In adjudicating disputes, judges must remain unencumbered by bias, partisanship, intimidation, or preferment, and empowered to speak their mind and act boldly and confidently, with freedom and liberty, and without fear or favor of any man or entity—including subjugation of their judicial authority to the political whims of other governmental branches.

Indeed, grievances cited 250 years ago against Britain's King George III in support of our nation's Declaration of Independence included reference to the monarch's tyrannical domination over judicial tenure and compensation to achieve his purposes.  Even so, our Founders likewise adopted legislative impeachment within a framework of checks and balances between the various branches of government.  The instant appeal presents the intersection of those two bedrock principles:  judicial independence and legislative impeachment.

41

Under the separation of powers doctrine, the authority, independence, and responsibilities of each governmental branch flows in relationship to the others. With his customary verbal acumen, Justice Robert Jackson declaimed:

> The actual art of governing under our Constitution does not and cannot conform to judicial definitions of the power of any of its branches based on isolated clauses or even single Articles torn from context. While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity.

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring). Consequently, the judiciary must remain vigilant both in protection of its own constitutional prerogatives and in safeguarding those of the other coordinate branches by strictly adhering to the well-established boundaries of the judicial domain. In my view, the majority's extraordinary and unprecedented use of this Court's supervisory writ power to intrude upon the legislature's exercise of its authority over impeachment erroneously oversteps the judiciary's "role in Kentucky's tripartite government." *Zuckerman v. Bevin*, 565 S.W.3d 580, 605-06 (Ky. 2018) (Minton, C.J., concurring).

### A. Judicial Supervisory Authority Does Not Extend to Conduct of Impeachment Proceedings.

Undoubtedly, this Court enjoys constitutional authority to issue a supervisory writ "to exercise control of the Court of Justice." KY. CONST. § 110(2)(a). We have previously held the availability of such a writ is limited to well-defined and compelling circumstances. *Commonwealth v. Carman*, 455 S.W.3d 916, 923 (Ky. 2015). This Court's authority to grant supervisory writs

42

existed in a similar form under the prior version of Section 110 and empowered "the highest court in the state, when there is no other adequate remedy, in the exercise of the ample and unquestioned power conferred upon it, [to] lay its superintending hand upon *any inferior jurisdiction* that is about to commit a *judicial wrong* and compel it to administer justice according to the right of the case[.]" *Ill. Cent. R.R. Co. v. Rice,* 156 S.W. 1075, 1076 (Ky. 1913) (emphasis added).

In addition, courts possess the inherent power, "once having obtained jurisdiction of a cause of action . . . as an incidental to its constitutional grant of power . . . to do all things reasonably necessary to the administration of justice in the case before it." *Smothers v. Lewis,* 672 S.W.2d 62, 64 (Ky. 1984). We explained the nature of this inherent authority as follows:

> The control over this inherent judicial power . . . is exclusively within the constitutional realm of the courts. As such, it is not within the purview of the legislature to grant or deny the power nor is it within the purview of the legislature to shape or fashion circumstances under which this inherently judicial power may be or may not be granted or denied.
>
> This Court has historically recognized constitutional limitations upon the power of the legislature to interfere with or to inhibit the performance of constitutionally granted and inherently provided judicial functions.

*Id.*

Contrary to the majority, I discern no basis in our Constitution, precedents, and tradition to support the issuance of a supervisory writ to control the legislature's authority over impeachment, especially on a provisional basis. By definition, the issuance of supervisory relief over the

43

Court of Justice entails a binding directive upon subordinate *courts and court personnel*, not the co-equal legislative or the executive branches of government. Similarly, I cannot conclude the exercise of the legislature's impeachment power has infringed upon the inherent constitutional authority of the judiciary in this matter.

Indeed, impeachment was designed by the Framers as a constitutional check on the executive and judicial branches. *Nixon v. United States*, 506 U.S. 224, 229 (1993). Reflecting this function, Section 66 of the Kentucky Constitution confers "the *sole power* of impeachment" upon the House of Representatives. (Emphasis added). Section 67 provides that the Senate shall have the power to try "[a]ll impeachments[.]" Section 68 delineates the persons subject to impeachment and the consequences proceeding therefrom as follows:

> [t]he Governor and all civil officers shall be liable to impeachment for any misdemeanors in office; but judgment in such cases shall not extend further than removal from office, and disqualification to hold any office of honor, trust or profit under this Commonwealth; but the party convicted shall, nevertheless, be subject and liable to indictment, trial and punishment by law.[42]

(Footnote added).

Moreover, in establishing the judicial power, Section 109 maintains that "[t]he impeachment powers of the General Assembly shall remain inviolate." In

---

[42] In *Commonwealth v. Tartar*, 239 S.W.2d 265, 267 (Ky. 1951), our predecessor Court stated that Section 68 "provide[s] for the impeachment of officers, which would include judges[.]" The reasoning of *Tartar* is consistent with the inclusion of judges within the category of "civil officers" subject to impeachment or removal under the Federal Constitution. *See Shurtleff v. United States*, 189 U.S. 311, 316 (1903); *United States v. Isaacs*, 493 F. 2d 1124, 1142 (7th Cir. 1974).

44

other constitutional contexts, this Court has defined the term "inviolate" to mean a right that is "unassailable." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 908 S.W.2d 104, 108 (Ky. 1995). Such inviolate rights "cannot be annulled, obstructed, impaired, or restricted by legislative or judicial action[,]" as the case may be. *Id.* In my view, the definition of this unique constitutional term applies equally to Section 109.

The text of Kentucky's impeachment provisions in Sections 66-68 have remained substantially unchanged throughout our prior constitutions[43] and closely parallels those set forth in Article I § 2, clause 5,[44], Article I § 3, clause 6,[45] and Article I § 3, clause 7 of the United States Constitution.[46] Specifically, the impeachment provisions in the Kentucky Constitution were directly modeled on those contained in the Pennsylvania and South Carolina Constitutions, which in turn, were directly modeled on the impeachment provisions contained in the United States Constitution. Brian C. Kalt, *The Constitutional Case for the Impeachability of Former Federal Officials: An Analysis of the Law, History, & Practice of Late Impeachment*, 6 Tex. Rev. L. &

---

[43] KY. CONST. Article IV. (1792); KY. CONST. Article V. (1799); KY. CONST. Article V. (1850).

[44] "The House of Representatives shall chuse their Speaker and other Officers; and shall have the sole Power of Impeachment."

[45] "The Senate shall have the sole Power to try all Impeachments. When sitting for that Purpose, they shall be on Oath or Affirmation. When the President of the United States is tried, the Chief Justice shall preside: And no Person shall be convicted without the Concurrence of two thirds of the Members present."

[46] Judgment in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States: but the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law.

Pol. 13, 112-13 (2001). In the absence of binding precedent, Kentucky courts have frequently looked to the decisions of the Supreme Court of the United States for guidance in interpreting similar "wording of the clause[s] in the federal and state Constitutions[.]" *Youman v. Commonwealth*, 224 S.W. 860, 862 (Ky. 1920).

In examining the Senate's power to try impeachments under Article I § 3, clause 6, the Supreme Court held the word "sole" relative to the grant of impeachment authority "indicates that this authority is reposed in the Senate and nowhere else." *Nixon*, 506 U.S. at 229. The Supreme Court further expounded upon the legal implications of a "sole" grant of impeachment authority:

> We think that the word "sole" is of considerable significance. Indeed, the word "sole" appears only one other time in the Constitution—with respect to the House of Representatives' "sole Power of Impeachment." Art. I, § 2, cl. 5 (emphasis added). The commonsense meaning of the word "sole" is that the Senate alone shall have authority to determine whether an individual should be acquitted or convicted. The dictionary definition bears this out. "Sole" is defined as "having no companion," "solitary," "being the only one," and "functioning . . . independently and without assistance or interference." Webster's Third New International Dictionary 2168 (1971). *If the courts may review the actions of the Senate in order to determine whether that body "tried" an impeached official, it is difficult to see how the Senate would be "functioning . . . independently and without assistance or interference."*

*Id.* at 230-31. (Emphasis added). "It would almost surely follow" from the reasoning of *Nixon* "that Article I, Section 2, Clause 5, which says '[t]he House of Representatives . . . shall have the sole Power of Impeachment,'" precludes the Supreme Court from "review of whether the House has proceeded on a

46

definition of impeachable offenses that is too lax or too strict." Laurence H. Tribe, *Defining "High Crimes and Misdemeanors": Basic Principles*, 67 Geo. Wash. L. Rev. 712, 714 (1999).

For this reason, "Congress has the last word in defining what constitutes an impeachable offense" and "[i]t appears to be common ground that judicial review would be unavailable to check the House or the Senate in their definitions of high crimes and misdemeanors[.]" *Id.* However, the fact that the definition of impeachable conduct is committed to the legislative branch does not imply that the term "misdemeanor" is without an accepted and traditional, if open-ended and flexible, meaning:

> Misdemeanor in office as ground for impeachment has a much broader coverage than the common law misdemeanor as usually defined and applied in criminal procedure. As applied to impeachment, 'misdemeanor in office' may include any act involving moral turpitude which is contrary to justice, honesty, principles, or good morals, if performed by virtue or authority of office. 'Misdemeanor in office' is synonymous with misconduct in office and is broad enough to embrace any wilful malfeasance, misfeasance, or nonfeasance in office. It may not necessarily imply corruption or criminal intent.

*In re Investigation of Cir. Judge of Eleventh Jud. Cir. of Fla.*, 93 So. 2d 601, 605-06 (Fla. 1957). In my view, the foregoing principles apply with equal force to the interpretation of the substantially similar impeachment provisions under Sections 66-68 of the Kentucky Constitution.

Importantly, it cannot be fairly maintained that the lack of judicial review insulates the legislative impeachment process from the system of checks and balances because "[t]he Framers anticipated" the potential for abuse and

47

usurpation of judicial authority that may result from such a sole grant of power to the legislature and

> created two constitutional safeguards to keep the Senate in check. The first safeguard is that the whole of the impeachment power is divided between the two legislative bodies, with the House given the right to accuse and the Senate given the right to judge. This split of authority "avoids the inconvenience of making the same persons both accusers and judges; and guards against the danger of persecution from the prevalency of a factious spirit in either of those branches." The second safeguard is the two-thirds supermajority vote requirement. Hamilton explained that "[a]s the concurrence of two-thirds of the senate will be requisite to a condemnation, the security to innocence, from this additional circumstance, will be as complete as itself can desire."

*Nixon*, 506 U.S. at 235-36 (internal citations omitted). Indeed, the absence of judicial review in this context is not surprising as "judicial involvement in impeachment proceedings, even if only for purposes of judicial review, is counterintuitive because it would eviscerate the 'important constitutional check' placed on the Judiciary by the Framers." *Id.* at 235.

The Supreme Court of Massachusetts has also expounded upon the sufficiency of non-judicial checks and balances in reference to the power of removal by address:[47]

> Any power may be abused. The judiciary might corruptly declare any law or body of laws to be unconstitutional and invalid, and thus encroach upon the powers of the Legislature; yet no one doubts the right and duty of the judiciary to declare invalid any law which in its judgment violates the Constitution.

---

[47] "Removal by address" operated as "a lesser alternative to impeachment." Shawn D. Chapman, *Removing Recalcitrant County Clerks in Kentucky*, 105 Ky. L.J. 261, 276; 299 (2017). Prior to the enactment of the Judicial Article, the Kentucky Constitution also provided for removal by address in addition to impeachment. *Compare* KY. CONST. §§ 66-68 *with* KY. CONST. § 117; § 136 (1891) (repealed 1976).

In confiding to the two coördinate [sic] branches of the government this important and exceptional power of removing the judiciary, the people found a sufficient protection to the substantial independence of the judicial department in the constitutional guaranties thrown around it, in the fact that the removal can only be made by the concurrent action of both houses of the Legislature and of the Governor and Council, all of whom are directly answerable to the people at frequently recurring periods, and in the trust and confidence they may rightfully repose in their servants and agents that in the exercise of any power committed to them they will act in obedience to their oaths of office, and in the spirit of the fundamental principles of the Constitution.

*Commonwealth v. Harriman*, 134 Mass. 314, 329 (1883).  Stated differently,

the impeachment power (like any other) could be abused or misused; but, once again, that does not mean it doesn't exist.  It is a power vested in the political bodies that possess it, for better or for worse.  *Constitutionally*, their independent judgments are fully as much to be credited as the judgments of judges.  Though political actors might not express their constitutional judgments in the same doctrine-heavy legal jargon as courts, that does not mean their constitutional judgments are any less entitled to constitutional respect.

Michael Stokes Paulsen, *Checking the Court*, 10 NYU J.L. & Liberty 18, 87-88 (2016).  Ultimately, whether evaluating an elected judge, executive officer, or legislator, whenever the electorate discerns unacceptable inaction, misdirection, or abuse, the people maintain the ultimate check on unsatisfactory elected officials—they can "throw the bums out" at the polls.

Thus, the impeachment power is not without constitutional limitations despite the sole grant of authority to the legislature.  Professor Tribe has eloquently explained:

Congress is essentially on its own in this vital realm.  But that is not to say that the deliberately political process of impeachment that the Framers left unpoliced by judicial overseers is not bound by the Constitution--by what it says as to impeachable offenses, and by what it means by what it says.  Article VI provides that all

49

senators and representatives "shall be bound by Oath or Affirmation, to support this Constitution." That duty is not relaxed whenever the judiciary is not on guard; it is heightened. Any solace that members of either the House or the Senate may sometimes take, in voting for a measure of contested constitutionality, that the Supreme Court will step in and save them from constitutional error if they are wrong--solace that I have elsewhere argued is inappropriate even when judicial review is in fact available to conduct just such a rescue mission--is manifestly unavailable here. Err here, and live forever with the consequences, for no judge will appear as a deus ex machina to set the constitutional system straight. Thus, the statements sometimes heard to the effect that an impeachable offense is whatever the House and Senate say it is are true only in the most cynical and constitutionally faithless sense. If those statements mean that Congress can "get away with murder" in this sphere, they are literally correct. But there are consequences to be suffered from defying the Constitution, even if those consequences do not include being reversed by judges. And if those statements about impeachable offenses being a content-less category, a mere mirror for the preferences of members of the House and Senate, mean that Congress simply is not constrained by the Constitution in this matter, then those statements are flatly false. Congress is indeed constrained, even if the only enforcer of that constraint is its own conscience.

*Tribe*, 67 Geo. Wash. L. Rev. at 714. In the final analysis, our constitutional system of representational democracy presupposes good faith, conformity to law, and that all governmental actors should endeavor to follow the better angels of our nature.

### B. Defective Petition Does Not Invalidate Impeachment Proceeding.

In light of the foregoing legal and historical background, I cannot agree with the majority's determination that defects in the impeachment petition constitute "a fundamental, fatal flaw in the impeachment proceedings against Judge Goodman[.]" Federal courts have specifically refused to interfere with legislative authority to oversee its own impeachment procedures. *Nixon*, 506

50

U.S. at 232; *Ritter v. United States*, 84 Ct.Cl. 293, 300 (1936), *cert. denied,*

*Ritter v. United States*, 300 U.S. 668 (1937).

In *Ritter*, the Court elaborated:

> *[F]rom a historical point of view it is quite evident that there was no thought at the time the constitutional provisions for impeachment were adopted of making the proceedings subject to review by the courts.* In the constitutional convention it was proposed by several members that impeachments should be tried by a special court consisting of a judge or judges. Madison preferred the Supreme Court. But these propositions were rejected and while there was some suggestion in the consideration of the matter that the Senate might abuse its power, *there was no intimation by anyone that the impeachment proceedings might be reviewed or set aside by the courts.*

*Id.* at 298 (emphasis added). Due to the similarities between the federal and

Kentucky provisions on impeachment, I perceive the reasoning of *Ritter* to

apply with equal force to the present matter.

Likewise, the majority's reliance on statements made by a prior House

Impeachment Committee, chaired by Rep. Nemes in 2021, cannot operate to

bind the legislature in a manner akin to the doctrine of stare decisis which

strictly governs judicial precedent. It is well-established that "one legislature

cannot abridge the powers of a succeeding legislature." *Fletcher v. Peck*, 10

U.S. 87, 135 (1810); *Billeter & Wiley v. State Highway Comm'n*, 261 S.W. 855,

860 (Ky. 1924). "In drafting and voting on articles of impeachment the House

can look at prior impeachments but is not bound by the actions of prior

Congresses, nor do prior Senate impeachment trials provide binding precedent

for future Senate trials." Clark D. Cunningham & Ute Romer-Barron,

51

*Impeachment Can Be Based On Non-Criminal Misconduct: Corpus Linguistic &*
*Historical Evidence*, 10 Ky. L.J. 845, 883-84 (2025).

Further, the function of the House in exercising its impeachment power is similar to that of a grand jury. *Ferguson v. Maddox*, 263 S.W. 888, 890 (Tex. 1924). "It investigates, hears witnesses, and determines whether or not there is sufficient ground to justify the presentment of charges, and, if so, [if] adopts appropriate articles and prefers them before the Senate." *Id.* A grand jury need not be presented with a criminal complaint or arrest citation, and it may investigate "independently of either the prosecuting attorney or judge." *Stengel v. Kentucky Bar Ass'n*, 162 S.W.3d 914, 919 (Ky. 2005) (parentheses omitted) (citation omitted). In addition, a grand jury "may determine alone the course of its inquiry." *United States v. Calandra*, 414 U.S. 338, 343 (1974). There are no constitutional requirements relative to the filing of an impeachment petition. Therefore, I would conclude the independent authority of the grand jury is analogous to the power of impeachment, and the legislature was entitled to rely upon its own judgment in proceeding with the impeachment process.

## C. Legislature Retains Discretion To Define Scope of Impeachable Offenses Notwithstanding the Availability of Appeal And Disciplinary Proceedings Under Section 121.

Contrary to the holding of the majority, I remain convinced the legislature retains the exclusive discretion to define the scope of impeachable offenses within the explicit textual limits set forth by Section 68 of the Kentucky Constitution. In my estimation, the majority erred by arrogating to

52

itself the question of whether the allegations in the impeachment petition rose to the level of impeachable conduct as defined by standards established in a prior 2021 impeachment proceeding. In *Ritter,* the Court held that it had

> *no authority to review the impeachment proceedings* held in the Senate and *decide whether the accusations made against the plaintiff were such that he could properly be impeached thereon* . . . In our opinion, the Senate was the sole tribunal that could take jurisdiction of the articles of impeachment presented to that body against the plaintiff and its decision is final.

84 Ct.Cl. at 300 (emphasis added); *Tribe,* 67 Geo. Wash. L. Rev. at 714.

In the same vein, the Supreme Court of Florida has aptly stated the pertinent standard:

> Since the House of Representatives is clothed with the sole power of impeachment, *it necessarily follows that it has the power to determine whether the charges brought against one amount to a 'misdemeanor in office' as contemplated by the Constitution.* It matters not what charge may be lodged against a judge, to be ground for impeachment it must amount to 'misdemeanor in office.'

*In re Investigation of Cir. Judge,* 93 So. 2d at 604 (emphasis added). I cannot discern any authority under which this Court may substitute its view for that of the legislature based solely on the allegations contained in the petition and standards promulgated during a prior impeachment proceeding. *Billeter,* 261 S.W. at 860.

I also disagree with the majority's reliance on the characterization of the alleged misconduct as set forth in the impeachment *petition* as opposed to the actual text of the *articles* of impeachment which describes the alleged misconduct in terms of an abuse of office consisting of "defiance" of binding

precedent, statutes, and court rules. In addition to her alleged defiance, the House has charged Judge Goodman with interfering "with the rights and powers of the grand jury, trial court jurors, attorneys, and others to perform their respective roles within the Kentucky Court of Justice." At a certain point, allegations of willful and deliberate disregard for the law become a pattern, "rather than a single or isolated misjudgment or misinterpretation[.]"[48] *Paulsen*, 10 NYU J.L. & Liberty at 87. Thus, it appears the allegations, as conceived by the judgment of the legislature, exceed mere disagreement with the outcome of judicial rulings. Ultimately, however, any judicial disagreement as to the nature of the alleged misconduct is academic because courts lack authority to second-guess the legislature's exercise of its constitutional impeachment power. *Nixon*, 506 U.S. at 232; *Ritter*, 84 Ct.Cl. at 300. Moreover, I have serious doubts about the propriety of courts weighing in on disputed issues of fact in advance of the Senate who is the constitutionally prescribed fact-finder in an impeachment proceeding under Section 67 of the Kentucky Constitution.

---

[48] For historical precedent, in 1916, County Judge J.E. Williams was impeached for "'corrupt misconduct and misdemeanors in . . . office,' which consisted of his improperly issuing arrest warrants, suspending or shortening criminal sentences, and failing to report fines he collected, among other charges." *Chapman*, 105 Ky. L.J. at 278-79 (footnotes omitted). Although he was ultimately acquitted in the Senate, the charges against County Judge Williams appear to be substantially similar to those in the present matter. *Id.* I would further note the historical rarity of judicial impeachment in this Commonwealth is a commendation of the character, fairmindedness, integrity, and wisdom of Kentucky's jurists. However, the absence of impeachment experience fails to illuminate the scope and existence of the legislature's impeachment power as a matter of constitutional interpretation.

In addition, I part ways with the majority relative to its conclusion that the present allegations of misconduct should have been addressed solely by the Judicial Conduct Commission ("JCC") under Section 121 which provides:

> Subject to rules of procedure to be established by the Supreme Court, and after notice and hearing, any justice of the Supreme Court or judge of the Court of Appeals, Circuit Court or District Court may be retired for disability or suspended without pay or removed for good cause by a commission composed of one judge of the Court of Appeals, selected by that court, one circuit judge and one district judge selected by a majority vote of the circuit judges and district judges, respectively, one member of the bar appointed by its governing body, and two persons, not members of the bench or bar, appointed by the Governor. The commission shall be a state body whose members shall hold office for four-year terms. Its actions shall be subject to judicial review by the Supreme Court.

Upon review, I do not perceive any specific constitutional language mandating the primacy of judicial removal by the JCC under Section 121 or otherwise endowing this Court with power to commandeer and override pending impeachment proceedings in favor of the JCC based on a judicial determination that the alleged misconduct before the legislature did not rise to the level of an impeachable offense. Plainly, such a proposition cannot be reconciled with the command of Section 109 that "[t]he impeachment powers of the General Assembly shall remain inviolate."

Additionally, I do not perceive any conflict between Section 121 and the provisions for impeachment under Sections 66-68 and 109. *See* KY CONST. § 124. Since the founding of the Commonwealth, Kentucky law has utilized a "comprehensive two-tier[ed]" approach to impeachment and removal. *Chapman*, 105 Ky. L.J. at 276. Prior to the enactment of the Judicial Article, it was held that "the legislature may investigate the opinions of judges with a

view to render them responsible for corruption, by impeachment, or for ignorance, by address and removal." *Gaines v. Buford*, 31 Ky. 481, 498-99 (1833); *see also Page v. Hardin*, 47 Ky. 648, 673 (1848) (holding judges were subject to impeachment for a misdemeanor in office and "liable to removal for any reasonable cause, not being sufficient ground of impeachment, upon address to the Governor by two-thirds of each house of the General Assembly[.]").  Removal by address was considered "a lesser alternative to impeachment." *Chapman*, 105 Ky. L.J. at 299.

In 1975, the enactment of the Judicial Article abolished the method of removal by address and replaced it with judicial discipline under the auspices of the JCC as set forth in Section 121.  *Id.* at 312.  Implementation of the JCC was intended to create an easier path for removing, in the words of Justice Palmore, "a no-good judge." *See id.* at 311 n.360.  At present, Kentucky's two-tiered approach to removal persists and

> as the law stands now, if the constitution provides a removal mechanism, the legislature cannot employ a different one (existing or new).  As noted above, removal by address no longer exists in the Kentucky Constitution.  Judges, as civil officers, are of course removable by impeachment.  Otherwise, they may only be removed by methods allowed by the constitution.  The only other existing method is retirement and removal under section 121, which replaced the address provision in the 1891 constitution.

*Id.* at 314 (footnote omitted).  Thus, impeachment and judicial discipline are neither conflicting nor interchangeable nor redundant, with each committed to the appropriate governmental sphere.  *Jameson v. Jud. Conduct Comm'n*, 701 S.W.3d 236, 283 (Ky. 2024) ("[T]o interpret the JCC's removal power under

Section 121 to include permanent removal from office encroaches upon the impeachment powers vested solely in our legislature.").

Based on the foregoing, I candidly fail to discern any textual, precedential, or historical support for the majority's conclusion that

> [t]he Legislature's current attempt to impeach a sitting judge based on behavior that clearly does not rise to the level of a misdemeanor in office is a thinly veiled and unconstitutional attempt to revive the practice of removal by address. . . .
>
> [And] that it is only the rarest of circumstances in which a sitting judge has committed either an actual, indictable crime or an offense in office constituting the most reprehensible moral turpitude that the Legislature is permitted to veer into the judge removal lane which is, under most circumstances, reserved solely for the Judiciary. Those circumstances simply are not present in this case and the Legislature has consequently intruded on the authority of both this Court, the Judicial Branch at large, and the constitutionally empowered Judicial Conduct Commission in entertaining impeachment proceedings against a sitting judge based solely on rulings that, right or wrong, were within her discretion to make.

In my view, the premise that the legislature is proceeding upon conduct "that clearly does not rise to the level of a misdemeanor in office" is invalid because a court lacks the authority to substitute its judgment for that of the legislature on this subject. Similarly, I perceive the majority's determination that impeachable misconduct must amount to "an actual, indictable crime or an offense in office constituting the most reprehensible moral turpitude" to be inconsistent with the legislature's exclusive authority over impeachment. *Nixon*, 506 U.S. at 232; *Ritter*, 84 Ct.Cl. at 300; *Jameson*, 701 S.W.3d at 283. "[A]s Justice Story observed, impeachable offenses are 'purely of a political nature' and defy definition or classification by statute. No statutes or common

57

law doctrines set forth the impeachable offenses that courts may then interpret or apply." Michael J. Gerhardt, *The Constitutional Limits to Impeachment and Its Alternatives*, 68 Tex. L. Rev. 1, 99 (1989).

### D. Due Process Claim Is Without Merit.

I would further reject Judge Goodman's claim that the impeachment proceeding violated her due process rights and protection against arbitrary action under Section 2 of the Kentucky Constitution. Impeachment proceedings are not necessarily governed by the standards applicable to ordinary judicial proceedings and are

> neither civil nor criminal in nature. [They are] brought for the sole purpose of deciding whether to remove and disqualify a state officer. The proceedings are neither under the control of the judiciary nor tried in a criminal court.

*Meacham v. Gordon*, 751 P.2d 957, 963 (Ariz. 1988). Prominent commentators on impeachment have observed that "courts may well decide that the impeachment hearing offered by the state (e.g., hearing by state legislature) is the only process which is due, given the special, unique, *political* nature of an impeachment hearing." Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law-Substance & Procedure*, § 8.15(a) n.10 (2025).

Judge Goodman's procedural claims are without merit because the legislature's sole authority to establish its own procedures, and its exclusive ability to determine compliance therewith, are "unreviewable by the courts[.]" *Nixon*, 506 U.S. at 232. Likewise, her argument relative to arbitrary and capricious action must fail. I do not perceive any indication the legislature has

58

acted arbitrarily or otherwise ventured beyond the explicit constitutional confines relative to its impeachment authority under Sections 66-68 and would further conclude such is all the process that is due in this instance.

The Supreme Court of Texas has cogently explained how legislative adherence to constitutional boundaries precludes a finding of arbitrariness relative to impeachment:

> There is no such thing under our government as arbitrary power. As has often been said, it is a government of laws, and not a government of men. We most emphatically repudiate the idea that any officer may be arbitrarily impeached. In the exercise of [their] exalted jurisdiction, [the House and] the Senate must proceed according to law. [They] must ascertain the law by an examination of the Constitution, legal treatises, the common law and parliamentary precedents, and therefrom determine the nature, elements, and characteristics of impeachable offenses, and, in the light of reason, apply the principles so worked out to the facts of the case before [them]. This is not arbitrary power. It is the exercise of judicial authority under the Constitution. There is a vast difference between arbitrary power and final authority. This court, in most cases, has final authority; but it has, and can exercise, no arbitrary power. So [the House convened to exercise the power of impeachment and] the Senate, sitting as a court of impeachment, [have], and in the nature of things should have, final authority; but [they], too, [are] wholly lacking in arbitrary power.

*Ferguson*, 263 S.W. at 892.

Additionally, Judge Goodman's claim that she was forced to stand silent before the House due to her obligations under the Judicial Canons does not warrant relief. SCR[49] 4.300, Canon 2.10 provides in pertinent part:

> (A) A judge shall not make any public statement that might reasonably be expected to affect the outcome or impair the fairness of a matter pending* or impending* in any court, or make any

---

[49] Rules of the Supreme Court.

nonpublic statement that might substantially interfere with a fair trial or hearing.

. . .

(D) Notwithstanding the restrictions in paragraph (A), a judge may make public statements in the course of official duties, may explain court procedures, and *may comment on any proceeding in which the judge is a litigant in a personal capacity.*

(E) Subject to the requirements of paragraph (A), a judge *may respond directly or through a third party to allegations* in the media or *elsewhere concerning the judge's conduct in a matter.*

Simply put, the limitation in the Judicial Canons that Judge Goodman invokes did not prohibit her and her attorneys from defending her conduct in pending cases during her testimony and filings before the legislature. As Founding Era Judge and Professor St. George Tucker observed "in his appendix to *Blackstone's Commentaries* that the 'uncontrollable authority' of the courts 'extend[ed] to every supposable case which can affect the life, liberty, or property of the citizens of America under the authority of the federal constitution, and laws, *except in the case of an impeachment.*'" William Baude, *Adjudication Outside Article III*, 133 Harv. L. Rev. 1511, 1541 (quoting St. George Tucker, 1 *Blackstone's Commentaries: With Notes of Reference* app. 354 (Philadelphia, William Young Birch & Abraham Small 1803)) (emphasis added).

### E. Conclusion.

To be clear, my determination that the General Assembly possesses constitutional authority to initiate and maintain the instant impeachment proceedings should not be understood as condoning its exercise of that authority in this case and under these facts nor as discounting the potential

60

deleterious impact such action may inflict upon the integrity and independence of the Judicial Branch. However, because I respectfully disagree with the majority that our Constitution authorizes courts to adjudicate questions relative to impeachments—which are constitutionally mandated to be conducted solely by the Legislative Branch—I cannot agree that this Court's review and grant of the instant supervisory writ petition presents a proper case in which this Court may exercise its limited authority. A plain reading of the pertinent constitutional provisions and consideration of their historical background counsels against judicial intervention.

"Judicial restraint does not equate to judicial abdication." *Cameron v. EMW Women's Surgical Center, P.S.C.*, 664 S.W.3d 633, 682 (Ky. 2023) (Nickell, J., concurring in part, dissenting in part). Certainly, judicial independence—both decisional and institutional—must be guarded with eternal vigilance. However, regardless of the relative merits of the present impeachment petition filed against Judge Goodman or any perceived failings of the procedures adopted by the General Assembly, I consider it error to judicially intrude upon governmental authority constitutionally reserved solely within the province of the General Assembly. Such matters, no matter how glaringly ill-advised, misdirected, or politically motivated, remain "resistant to judicial cure" due to lacking "Constitutional textual authority and any definitive framework of guiding rules and standards." *Graham v. Adams*, 684 S.W.3d 663, 702 (Ky. 2023) (Nickell, J., concurring in part, dissenting in part).

61

For the foregoing reasons and based on my respectful disagreement as to the constitutional provisions and the legal authorities cited by the majority, I am compelled to dissent.

ENTERED: April 6, 2026

_____
CHIEF JUSTICE

COUNSEL FOR PETITIONER:

Robert Kennedy McBride
McBride Law PLLC

Mitchel Terence Denham
Katherine Kilkeary Yunker
McBrayer PLLC


COUNSEL FOR RESPONDENTS, JASON NEMES, IN
HIS OFFICIAL CAPACITY AS CHAIR OF THE HOUSE OF
REPRESENTATIVES IMPEACHMENT COMMITTEE; AND
DAVID OSBORNE IN HIS OFFICIAL CAPACITY AS SPEAKER
OF THE HOUSE OF REPRESENTATIVES:

David Eric Lycan
Office of the Speaker of the House


COUNSEL FOR RESPONDENT, RUSSELL COLEMAN,
IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF
THE COMMONWEALTH OF KENTUCKY:

Jacob M. Abrahamson
Shawn D. Chapman
John H. Heyburn
Matthew F. Kuhn
Office of the Attorney General


COUNSEL FOR RESPONDENT, HON. PHILLIP J. SHEPHERD:

Pro Se

COUNSEL FOR RESPONDENT, KILLIAN TIMONEY:

Pro Se


COUNSEL FOR AMICUS CURIAE, KENTUCKY
ASSOCIATION OF CRIMINAL DEFENSE LAWYERS:

J. David Niehaus